**Frank SCHULTE et al., Plaintiffs in Error,**

v.

**OKLAHOMA CITY, a municipal corporation, Defendant in Error.**

**No. 43209.**

Supreme Court of Oklahoma.

Jan. 18, 1972.

Rehearing Denied March 21, 1972.

Fowler, Rucks, Baker, Jopling, Gramlich & Mee, McClelland, Collins, Sheehan, Bailey & Bailey, by William F. Collins, Jr., H. B. Scoggins, Jr., Oklahoma City, for plaintiffs in error.

Roy H. Semtner, Municipal Counselor, Walter M. Powell, Assistant Municipal Counselor, Oklahoma City, for defendant in error.

LAVENDER, Justice.

This appeal, from the District Court of Oklahoma County, involves matters of evidence in the jury trial of a condemnation proceeding brought by the City of Oklahoma City. The jury's verdict was for less than the amount of the commissioners' award, which had been deposited with the court clerk of the city and withdrawn by the landowners. The trial court entered judgment for the city and against the landowners for the difference, with interest from the date of the verdict. The landowners appealed to this court.

The condemnation proceeding was commenced, on December 3, 1962, by the defendant in error, City of Oklahoma City, pursuant to a resolution of necessity adopted by its City Council on March 20, 1962, to acquire title to the Southeast Quarter of Section 26, Township 11 North, Range 4 West, in Oklahoma County, for airport purposes and for the construction, operation and maintenance of an airport thereon, and uses incidental thereto.

Title to the 160-acre tract in question in the plaintiffs in error, Frank Schulte, Wm. J. Schulte, and The First National Bank and Trust Company of Oklahoma City as Trustee for Annette Vogt Gravitt and Jeanette Vogt Bollman, is not questioned, and the city's right to take the title to the tract is not questioned. According to the pre-trial order, damages to property not taken are not involved.

Commissioners appointed by a judge of the district court reported the total damages to these landowners as a result of the taking of this tract to be $340,000.00. Demands for a trial by jury on the question of just compensation were filed upon behalf of the city and upon behalf of these landowners. The amount of the commissioners' award was paid into the office of the court clerk by the city for the benefit of these owners on February 13, 1963, and was disbursed to them on January 3, 1964, after they withdrew their objections to the right of the city to take a fee title to the entire tract.

Jury trial resulted in a verdict for these landowners in the amount of $256,000.00. Based on that verdict and the landowners' withdrawal of the $340,000.00 award money, the trial court entered judgment for

the city and against the landowners in the amount of $84,000.00, with interest thereon at the rate of six per cent per annum from the date of the verdict (March 21, 1968).

On appeal, the landowners present their assignments of error under three propositions. The first two propositions involve the same legal theory and are argued together:

1. "The trial court erred in refusing the introduction into evidence of testimony and documents to show the value of the property as it would have been if no airport expansion had been contemplated or announced."

2. "The trial court erred in refusing to allow witnesses to testify as to public knowledge and personal knowledge of the announced and impending condemnation."

They do not question this court's many decisions to the effect that, when private property is taken for public purposes, just compensation is the fair market value of the property as of the time of the taking, which, when the amount of the commissioners' award is paid into the court clerk's office for the benefit of the landowners, is the date such deposit is made—in this instance, February 13, 1963.

Their theory is that, if the value of the property as of the time of the taking has been depressed by the condemnor's prior announcement that the property would be taken for public use, the principles of just compensation for property so taken require that the landowner receive what its fair market value would be, at the time of the taking, if it had not been subject to the threat of condemnation and was not being taken.

The landowners do not cite any Oklahoma case in support of this theory. They do cite cases from five other states (Arizona, Florida, Georgia, Minnesota, and Texas) which would support the principle that a condemnor cannot take advantage of a depressed valuation which results from its own acts.

The cited Florida case, State Road Department of Florida v. Chicone et al. (1963), 158 So.2d 753, is the one most nearly in point on the facts contended for by the landowners herein, and does support the principle of law relied upon by them.

In that case, the Florida Road Department had publicly announced, in 1957, the route for an interstate highway through the City of Orlando. Four of the parcels required for the announced right-of-way were owned by the appellees and, at the time of the announcement, had improvements thereon, all of which were leased out to others. Proceedings to condemn those parcels were not commenced until May 10, 1960 (the time of taking, under the Florida decisions). Expert witnesses for the Department stated that their valuations as of May 10, 1960, reflected a discount from the value as of the date the announcement had been made, based upon the resulting decrease in the rental value of the property in the interim. The trial court refused to strike their testimony as to value, but later granted the landowners a new trial because of error in doing so. A District Court of Appeal affirmed the trial court in granting a new trial, and, on certiorari to review the decision of the Court of Appeal, the Supreme Court of Florida held that the result was correct:

In doing so, the Supreme Court of Florida concluded that the value of the property taken at the time of the taking, as depreciated or depressed by the prospect of condemnation, is not a proper basis or measure of compensation for the property taken. It held that, in such circumstances, compensation should be based on the value of the property as it would be at the time of the taking if it had not been subjected to the debilitating threat of condemnation and was not being taken.

In the present case, it is not necessary for us to determine whether or not those principles of law would be applicable in Oklahoma. Contrary to the land-

owners' contention, their expert witnesses concerning value of the property taken were not prevented from testifying as to the value of the property as it would have been at the time of the taking if it had not been subjected to the threat of condemnation and was not being taken. Those were the valuations they gave, and those valuations were given without the landowners having been required to show public knowledge that this land would be condemned, or even a public announcement that it would be taken.

As of the date of the taking (February 13, 1963), the 160-acre tract of land involved herein was "raw" farm land with no buildings thereon, and, except for a very few years when it had been farmed by Frank Schulte or by Wm. J. Schulte, had been leased to others for agricultural purposes. It had not been developed, or even platted for development, at that time. It was abutted on the south by a graveled county road known as Southwest 74th Street, and on the east by a hard-topped county road known as South Portland, both of which were extensions of Oklahoma City streets with the same names.

One witness for the landowners, Leslie Judd (mentioned later in connection with the landowners' third proposition), who had been a real estate "planner" for more than twenty years in the Oklahoma City metropolitan area, testified that the entire tract was generally flat and level and was well adapted for development for residential and commercial purposes; that, shortly before the trial, he had prepared a plat of the tract, on which he set aside 18 acres at the intersection of 74th and Portland for commercial purposes and divided the remaining 142 acres into blocks and lots; and that, in his opinion, the tract was ready for development as of February 13, 1963, even though the nearest developed tract was a half-mile away. He also testified that the cost of development, including the cost of paving the streets, installing water and sewer lines, and connecting them to the nearest available water and sewer mains, was a factor that would be

considered by any one considering the purchase of a tract for such a development. He gave his estimates of the costs of developing the tract as set forth on his plat, including the cost, per running foot, for constructing water and sewer lines to the nearest available mains, which, he thought were a half-mile away, but might be a mile and a half away. His plat was received in evidence, and the landowners' expert witnesses concerning value of the tract applied their per-acre valuations for different purposes on the basis of his division between commercial and residential purposes.

The landowners' counsel asked each of their three expert witnesses concerning value if he had an opinion as to the fair market value of this tract as of February 13, 1963. Receiving an affirmative answer, he asked each of these experts for his opinion as to such value and what he had considered in arriving at his estimate of such value. Each had considered sales, made between August 24, 1959, and July 19, 1965, of tracts of "raw" land that he considered to be "comparable" properties, which varied in size from 1.03 acres to 305 acres and in location from one-half mile to three and one-half miles from this tract of land, and had made adjustments for differences between the tracts with respect to various pertinent factors, such as terrain, distance from existing water and sanitary sewer mains, frontage on a main thoroughfare, distance from central Oklahoma City, and proximity to the on and off ramps of a nearby interstate highway.

In selecting sales of comparable properties to be considered in estimating the fair market value of this tract, each of these witnesses purposely considered only properties outside the Will Rogers Airport expansion area. None of them mentioned the threat, and lack of threat, of condemnation as factors to be considered in making such a comparison. On cross-examination, one of them stated that he had not considered a particular sale mentioned by the city's counsel because, at the time of the sale, it was public knowledge that

that tract was going to be taken by the city for the airport expansion. An additional question concerning that tract brought forth a statement by the landowners' counsel, not denied by the city's counsel, that it had been agreed that sales of land within the airport expansion area would not be used for valuation purposes. Thus, these witnesses appraised this property as though it were outside the airport expansion area and was not being taken in condemnation.

Although not expressly asked, on the witness stand, to give their valuation of the property in question on such a basis, the witnesses' opinions as to value were on the basis of the measure of compensation stated in the above-cited Florida case.

The trial court did not refuse to allow any witness for the landowners to testify as to the fair market value of this property as it would have been at the time of the taking if there had been no threat of condemnation and the property was not being taken. Their opinions as to value were given, and received in evidence, on that basis, without objection and without any evidence of any public announcement, or public knowledge, of a plan by the city to acquire this property, by condemnation if necessary, for airport expansion purposes. We find no offer by the landowners of any testimony as to such a public announcement or public knowledge. In the circumstances, no evidence of such a public announcement or public knowledge was needed.

If any offer of proof made by the landowners can be construed as an offer of evidence of such a public announcement, or public knowledge, of such a plan by the city, the rejection of such evidence was not prejudicial to the landowners.

This last-mentioned statement also applies to the landowners' Exhibits Nos. 5 through 16, and 17 and 18, involved in their first proposition. Insofar as possibly pertinent to the landowners' first and second propositions, their Exhibits 5 through 16 (as excerpted in the case-made, with some of them not included at all) would

show no more than that, according to the city's official records, the City of Oklahoma City had some plans, as early as April 51, 1958, for the ultimate inclusion of this tract of land in its Will Rogers Airport, but, of themselves, would not indicate any public announcement, or public knowledge, of such a plan. Exhibit 17, which is a certified copy of the resolution of necessity adopted by the City Council of Oklahoma City on March 20 1962 (referred to in the city's petition in condemnation), would, insofar as possibly pertinent hereto, show no more than that, as of March 20, the city intended to acquire, as quickly as possible and by condemnation if necessary, the tract of land involved herein, and other lands in the vicinity thereof, for airport purposes. No portion of the landowners' Exhibit 18 appears in the case-made.

The landowners' first and second propositions must be denied. 12 O.S.1961 § 78; 22 O.S.1961 § 1068.

The landowners' remaining proposition is to the effect that the trial court erred in allowing witnesses for the city, who had qualified only as licensed real estate brokers and professional real estate appraisers, to testify, over the landowners' objections, concerning engineering aspects of the development of real estate and the costs thereof, and in refusing the landowners' offer of testimony in rebuttal thereof.

The first portion of the proposition involves the city's witnesses Howard Sears and Frank Grass. The latter portion involves the landowners' witness Leslie Judd, who prepared a plat for the development of the tract in question and testified concerning the costs of such development as of February 13, 1963, as hereinabove mentioned.

The landowners made only one objection during the examination of Mr. Grass. It was an objection to his testifying concerning a particular sale transaction and was sustained.

They made four objections during the testimony of Mr. Sears. One of them was

to an answer as not being responsive to the question asked, and was sustained. The trial court did overrule their other three objections.

■ One of those objections was to the city's counsel leading the witness by asking if "skip development" was not, sometimes, the result of people wanting to be out by themselves. If the overruling of that objection was error, it was not prejudicial error.

■ Another one of those objections was that the witness had not been qualified to answer a question as to whether or not the fact that water and sewer mains had not yet been extended all the way out to a tract of land, so that a developer would have to construct water and sewer lines to the nearest available mains, was a factor considered by land developers in connection with a possible purchase of a tract of land for development purposes. Particularly in view of the fact that the landowners' own witness Judd (and one or more of their experts on value) had previously testified that it was such a factor, the overruling of that objection, if error, was not prejudicial error.

■ The other objection assumed that the witness' answer to a question would be hearsay unless he were an engineer. The question was whether or not, in view of the elevations involved, sanitary sewers on the tract involved herein could have been tied into the sewer main at the "Madole" tract, one-half mile east of this tract, and be used without installing at least one lift pump. The witness' answer that, in his opinion, they could not have been was based upon his examination of topographic maps of the area involved. Particularly in view of the fact that the testimony of the landowners' witness Judd (who did not purport to be an engineer), offered in rebuttal, would have been based upon his examination of topographic maps and sewer plans in the office of the City Engineer of Oklahoma City, rather than upon his personal knowledge of the elevations involved; the overruling of this objection, if error, was not prejudicial error.

■ Mr. Judd was recalled to the stand by the landowners, as a rebuttal witness, and was asked if he had, at counsel's request, made a check to determine whether the sewer main at the "Madole" tract could be tied into or would it be necessary to go north a mile and a half with a sewer line in order to develop the tract involved herein. He answered that he had checked the records just mentioned above, and, when asked by the city's counsel if he had checked with any department of the city to find out if the city would have allowed such a connection at the "Madole" tract, answered that he had not. After the court had sustained the city's objection to his testifying about the matter of connections to the city's mains, in view of his prior testimony on the matter and his lack of knowledge as to whether the city would have permitted a connection at the "Madole" tract, the landowners' counsel offered to prove by Mr. Judd that he had checked the engineering and that using the sewer main at the "Madole" tract would require a lift pump, which would cost an additional $15,000 and increase the total cost of development, as estimated by him when testifying in chief, by that much, but if they had to go to the north of the tract involved herein, a lift pump would not be required. The trial court sustained an objection to the effect that such testimony would not change his testimony in chief.

The proffered "rebuttal" testimony of Mr. Judd would only serve to increase his prior estimate of the total cost of developing the tract in question *if* the city would have allowed the sanitary sewers on this tract to be connected to the city's sewer main at the "Madole" tract, using a lift pump. The sustaining of the city's objection to such proffered testimony, if error, was not prejudicial to the landowners.

Their third proposition cannot be sustained.

The decision of the Court of Appeals is reversed and the judgment of the district court is affirmed.

All of the justices concur.